UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORTH CASCADES CONSERVATION COUNCIL, a nonprofit organization,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL PARK SERVICE et al.,,<br><br>Defendant. | CASE NO. 2:26-cv-03318-JHC<br><br>TEMPORARY RESTRAINING ORDER |

## I

## INTRODUCTION

This matter comes before the Court on Plaintiff North Cascades Conservation Council's motion for a temporary restraining order (TRO). Dkt. # 6. Defendants received notice of the motion and filed an opposition brief. Dkt. # 11.

Plaintiff asks the Court to enjoin Defendants from granting permission or otherwise authorizing work related to the Company Creek Road building project within the Stehekin River. *See* Dkt. # 6 at 23-24. The Court has considered the materials filed in support of and in opposition to the motion, the record, and the governing law. For the reasons below, the Court GRANTS Plaintiff's motion.

## II
## BACKGROUND

This case concerns road building activity in a channel of the Stehekin River located within the North Cascades National Park Complex. *See* Dkt. # 1.

On December 11, 2025, a major flooding event destroyed a portion of Company Creek Road and changed the course of the river, so that it flows freely over the former location of the road. Dkt. # 8 at 2; Dkt. # 11-1 at 4; Dkt. # 7-1 at 2. In the spring of 2026, Defendant National Park Service (NPS) began developing a plan for road construction. *Id.* at 3-4. This included compliance with the National Environmental Policy Act (NEPA) in the form of a Categorical Exclusion (CE) issued on March 27, 2026. *Id.* At these early stages, the proposal suggested rebuilding the road outside the river channel. *Id.*; *see also* Dkt. # 7-2.

After construction started, it became clear that the construction would need to go through the edge of private property. Dkt. # 7-1 at 3-4. The landowner refused to provide NPS temporary access through their land. *Id.* On August 28, 2026, NPS issued a new CE and issued a special use permit (SUP) to Chelan County to construct a 300- to 350-foot road segment within the channel of the river. *Id.* at 4-7. This proposal requires dewatering part of the river, putting 300 to 350 feet of road within the channel of the river, and rechanneling the river to the north. *Id.* This road is meant to be temporary and is slated for future removal and accompanying restoration of the river channel. *Id.* According to the August CE, "[t]he road segment must be re-constructed to allow access to residents on inholding parcels access to their homes and egress from the area, including emergency egress, as well as to provide flood and erosion protection for

homes, other properties and road segments, and NPS resources."[1] Dkt. # 7-1 at 8; *see also* Dkt. # 11-1 at 5-6. NPS says this access is needed before the fall flood season. Dkt. # 11-1 at 9.

On September 8, 2026, the Washington Department of Fish and Wildlife (WDFW) conducted a field visit and determined that the new reconstruction project would destroy salmon spawning and rearing habitat, estimating that 400 to 500 kokanee salmon would be within the project's footprint and that those numbers were expected to increase as the project continued. Dkt. # 7-4; Dkt. # 11-2 at 16. Because the new construction had not yet begun, NPS issued a revised CE on September 18, 2026, and updated the SUP to address the environmental impacts raised by the WDFW. Dkt. # 11-1 at 7-8; *see also* Dkt. # 11-2.

Construction under the SUP was set to begin on or around September 21, 2026. Dkt. # 11-2 at 5.

## III
## DISCUSSION

The legal standards for a preliminary injunction and a TRO are "substantially identical." *Stuhlbarg Int'l Sales Co v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a TRO, Plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of" a TRO; (3) "the balance of equities tips in [their] favor"; and (4) a TRO "is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter,* 555 U.S. at 20) (these are called the "*Winter*

[1] Residents seemingly have access to their property because they have created a "de facto" road that does not cross the river, which they selectively allow non-residents to use. Dkt. # 11-1 at 6; *see also* Dkt. # 6 at 3.

factors). The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Ninth Circuit applies a "sliding scale" approach, in which a stronger showing as to one or more factors can outweigh weaker showings as to other factors. *See Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

The purpose of the TRO is to preserve the status quo. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974); *Jones v. H.S.B.C. (USA)*, 844 F. Supp. 2d 1099, 1100 (S.D. Cal. 2012) ("The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing may be held."); *Arizona Recovery Hous. Ass'n v. Arizona Dep't of Health Servs.*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020) ("The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, while the purpose of a [TRO] is to preserve the status quo before a preliminary injunction hearing may be held." (citation omitted) (alteration in original)).

A. Likelihood of Success on the Merits

1. APA

"Under the APA, an agency action may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't. of Agric.*, 499 F.3d 1108, 1114-1115 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). While "courts should uphold reasonable and defensible constructions of an agency's enabling act, they must not rubber-stamp administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (internal citation and quotation omitted).

"[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alaska Dep't of Health & Soc. Servs. v. Centers for Medicare & Medicaid Servs.*, 424 F.3d 931, 934 (9th Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (original brackets)). Further, "[c]onstructions that are contrary to clear Congressional intent or frustrate the policy that Congress sought to implement must be rejected. An agency may not ignore factors Congress explicitly required be taken into account." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007).

2. NEPA

NEPA aims to "create and maintain conditions under which man and nature can exist in productive harmony," 42 U.S.C. § 4331(a), and "is designed 'to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man.' 42 U.S.C. § 4321." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). "NEPA is purely procedural . . . Otherwise stated, NEPA 'does not mandate particular results, but simply prescribes the necessary process' for an agency's environmental review of a project." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)); *see also Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) ("NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences.").

"An agency can comply with NEPA in three ways: (1) it can prepare an Environmental Impact Statement ('EIS'); (2) it can prepare an Environmental Assessment ('EA'); or (3) it can

invoke a Categorical Exclusion ('CE') to avoid preparing an EIS or EA." *Friends of the Inyo v. United States Forest Serv.*, 103 F.4th 543, 547 (9th Cir. 2024). This case involves the invocation of CEs.

"CEs represent a 'more expedited track available for a limited set of agency actions . . . "that normally do not have a significant effect on the human environment."'" *Friends of the Inyo*, 103 F.4th at 547. When an agency considers using a CE, "[a]ny action that is normally categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances in § 46.215; if it does, further analysis and environmental documents must be prepared for the action." 43 C.F.R. § 46.205(c)(1).

3. Analysis

The Court finds that, at this preliminary stage, Plaintiff has met its burden of showing a likelihood of success. Plaintiff has demonstrated that the agency failed to consider an important aspect of the problem under the APA.

Plaintiff says that NPS failed to conduct or appropriately consider the analysis of extraordinary circumstances as required under 43 C.F.R. § 46.205(c)(1). Dkt. # 6 at 10-12. It says that, had NPS done so, the project would have required an EIS or EA. *Id.*

Plaintiff invokes 43 C.F.R. § 46.215(b), which finds a project to be an extraordinary circumstance requiring additional review when the project will:

> Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas.

43 C.F.R. § 46.215(b).

The project seems to fall squarely within this definition. As the August CE says that "[t]he proposed project will directly impact approximately 1.64 acres of aquatic habitat during

dewatering, construction, and demobilization activities." Dkt. # 7-1 at 13. It says that "[a]pproximately 1.05 acres of habitat will be filled with rip-rap and other materials this area is expected to remain impacted until the completion of the long-term project." *Id.* And yet, the August CE failed to consider the impact on the aquatic life or ecology within these habitats. *See id.* (admitting that "[t]he impacts from compaction are uncertain" but projecting recovering in two to three years); *see also id.* at 23 (admitting "modeling has not been developed to understand and quantify the hydraulic impacts"). Based on the record before the Court, it appears NPS failed to consider an important aspect of the problem.

Although the September CE did contemplate the findings of WDFW and determined the impact on the salmon to be small in comparison to the population as a whole, *see* Dkt. # 11-2 at 15-16, this does not cure the original failure. First, the Court is not convinced that this September CE cures the APA violations because "when an agency applies CEs in a way that circumvents NEPA's procedural requirements and renders the environmental impact of a proposed action unknown, the purpose of the exclusions is undermined." *Friends of the Inyo v.*, 103 F.4th at 556; *see also Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (holding the "comprehensive 'hard look' mandated by Congress and required by the statute must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made").

Second, even though the September CE acknowledges the problem, it follows the course of the August CE in failing to consider the effect of the created problem. *See* Dkt. # 11-2 at 15-16 ("[t]he duration of these impacts is unknown, but may resolve after a cobble mobilizing event"); *see also* (stating that the diversion channel "will be constructed without design specifications that consider fishery resources and habitat the channel has the potential to form a stranding risk for aquatic species during cycles of wetting and drying as flows rise and recede").

On the record before the Court, it appears Plaintiff has made a strong showing of a high likelihood of success and thus the first factor strongly favors Plaintiff.[2]

B. Remaining Factors

"Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (holding that no "rule that any potential environmental injury automatically merits an injunction.") (quoting *McNair*, 537 F.3d at 1005)). As Plaintiff has established, irreparable harm is likely. *See* Dkt. # 8. Still, for the reasons explained by Defendant, Plaintiff's showing of the irreparable harm is not particularly strong. Dkt. # 11 at 22-26.

When the government is a party, the analysis of the remaining two factors merge. *Drakes Bay Oyster Co.*, 747 F.3d at 1092. Plaintiff has made a showing that the balance of the equities favors a TRO and that a TRO is in the public interest. *See* Dkt. # 6 at 21-23. The Court considers NPS's need for emergency access; however, this need is expressed primarily in briefing before this Court. *See* Dkt. # 11 at 26-29. Even as recently as the September CE, NPS primarily raised concerns over property owner access, and as described, the property owners appear to have made a "de facto" solution. *See* Dkt. # 11-2 at 5-6. These factors weigh in Plaintiff's favor.

Although Plaintiff's showing of irreparable harm is not particularly strong, due to the strength of the first factor, and because the last two factors weigh in Plaintiff's favor, the Court finds a TRO appropriate.

---

[2] Because the Court finds a high likelihood of success on Plaintiff's claims under NEPA, it need not consider Plaintiff's other claims for relief.

## IV

## CONCLUSION

The Court GRANTS Plaintiffs' Motion for a Temporary Restraining Order. Dkt # 6. The Court temporarily ENJOINS Defendants as follows:

(1) Defendants are enjoined from taking any physical action to further the proposed road construction project; including but not limited to:

  a. Any construction or building activity within the channel migration zone of the Stehekin River;

  b. Any operation of heavy equipment within the channel migration zone of the Stehekin River;

  c. Any installation or placement of water diversion, anchoring, or coffering devices, including but not limited to sheet piles, HESCO barriers, or coffer dams equipment within the channel migration zone of the Stehekin River;

  d. Any dewatering of the Stehekin River; and

  e. Any placement of fill into the Stehekin River.

(2) Defendants are further enjoined from issuing any approval or any permit to take any action listed in item number 1, above. To the extent that any such approval has already been given by the federal defendants, it shall be immediately withdrawn or suspended and the federal defendants shall provide immediate notice to any person or entity that received such approval or permit of the withdrawal or suspension.

(3) Although a bond may be required when granting injunctive relief, the Court declines to require a bond. *See Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999) ("The district court is afforded wide discretion in setting the amount of the bond.");

*Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000) (finding that the bond amount may be zero if there is no evidence the party will suffer damages from the injunction).

(4) The TRO will be effective on the day it is filed and will remain in effect until October 16, 2026, unless extended by order of the Court.

(5) The Court DIRECTS Plaintiff to submit a motion for preliminary injunction by October 2, 2026. Defendants may file a response by October 9, 2026. Plaintiff's optional reply must be filed by October 13, 2026.

Dated this 28th day of September, 2026.

John H. Chun
United States District Judge